**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SHEABRA L. SIMPSON, PhD.,

       Plaintiff,

                                         CASE NO. 04-70978

v.                                         HON. LAWRENCE P. ZATKOFF

UNITED AUTO WORKERS LOCAL 6000,
INTERNATIONAL UNITED AUTO WORKERS,
MARY ETTINGER, and DAVID BURTCH,
Jointly and severally,

       Defendants.

_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the Theodore Levin United States Courthouse,
in the City of Detroit, State of Michigan, on

PRESENT:  THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment.  The motion

has been fully briefed.   The Court finds that the facts and legal arguments are adequately presented

in the parties' papers and the decisional process would not be significantly aided by oral argument.

Therefore, pursuant to E.D. MICH. LR 7.1(e)(2), it is hereby ORDERED that the motion be resolved

on the briefs submitted.  For the reasons set forth below, Defendants' motion for summary judgment

will be GRANTED.

## II.  BACKGROUND

Plaintiff Sheabra Simpson, Ph.D, an African-American female, brings this discrimination action against her former employer, Defendant United Auto Workers Local 6000 (hereinafter "Local"), and its former president, Defendant Mary Ettinger. Plaintiff has also named Defendant International United Auto Workers (hereinafter "International"), and Defendant David Burtch, a union official with Defendant International. Plaintiff alleges that Defendant Local unlawfully fired her from her position as an appointed Steward-at-Large and returned her to her employment with the Michigan Department of Corrections, (hereinafter "MDOC") because of her race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* Plaintiff also claims that Defendant Local retaliated against her because of her activities before the Equal Employment Opportunity Commission (hereinafter "EEOC"), in violation of Title VII. Finally, Plaintiff alleges that Defendant Local's racially based termination caused her to be terminated from her employment with the MDOC, in violation of 42 U.S.C. § 1981.[1]

## A.    Facts

Plaintiff Simpson obtained a doctoral degree in social psychology and clinical psychology from the Wright Institute in Los Angeles, California, in 1981. In 1989, Plaintiff obtained a license to practice psychology in Michigan. That same year she began working as a psychologist with the MDOC at the Western Wayne Correctional Facility. Plaintiff also became a member of Defendant Local.

Plaintiff alleges that she had "extreme problems with her MDOC supervisors . . . ." Plaintiff's Response to Defendants' Motion for Summary Judgment, at 3. Plaintiff alleges that these

---

[1] Plaintiff has named the MDOC in a separate lawsuit that is also pending before this Court. *See Simpson v. UAW, et al.*, No. 04-7462.

2

problems culminated in a 1997 lawsuit against the MDOC in which Plaintiff alleged racial and sexual harassment, race and sex discrimination in promotions, and unlawful retaliation under the Michigan Civil Rights Act.[2]  The trial court awarded the MDOC summary judgment, which was affirmed on appeal by the Michigan Court of Appeals.

Plaintiff alleges that her relationship with MDOC management worsened after she filed her lawsuit in 1997.  Plaintiff claims that she filed numerous grievances against MDOC management for "improper 'stop orders,' physical assault by a supervisor, improper insubordination investigation, improperly issued interim rating for charges fabricated by management, continued harassment by management, hostile work environment created by management, memorandum written to prisoners putting Plaintiff's life in danger, disparate treatment, [and] improper performance evaluation." Plaintiff's Response to Defendants' Motion for Summary Judgment, at 3.  With the assistance of Defendant Local's representatives, Plaintiff also filed several complaints with the EEOC against the MDOC during this time period.  *See id.* at 3.

In July, 2000, amidst the above employment problems with the MDOC, Plaintiff was appointed to a full-time union staff position by then president of Defendant Local, Lynda Taylor-Lewis.   Plaintiff alleges that she worked as a Staff Specialist, Steward-at-Large, Local Representative, and Chief Steward-at-Large, during her three-year tenure as a local union staff employee.  She alleges that at all times she performed in "an exemplary fashion." Compl. at ¶ 23.

In order to accommodate Defendant Local's request to employ Plaintiff, the MDOC placed Plaintiff on a paid leave of absence.  Under the collective bargaining agreement (hereinafter "CBA") between Defendant Local and the MDOC, State employees may be appointed to full-time union

---

[2] Plaintiff does not allege where the lawsuit was filed.

3

positions under one of two different sections of the agreement, Article 18D or Article 7D.  If the employee is appointed under Article 18D, the employee is "relieved of all work duties during the course of such leave; and the Union shall reimburse the State, for the gross total cost of such employee(s) wages, and the Employer's share of premiums for all insurance programs."  Article 18D, attached as Plaintiff's Ex. 19.  If the employee is appointed under Article 7D, however, the employee takes advantage of an "Administrative Leave Bank," which the parties agree allows the employee to take a leave of absence from State employment, but remain on the State's payroll.  Article 7D, attached as Plaintiff's Ex. 19.  For employees appointed under Article 7D, the union only reimburses the State for employee benefit costs.  *See* Rivera Dep. at 25-26.  Although documents show that Plaintiff was initially appointed under Article 18D, *see* Plaintiff's Ex. 19, the parties agree that at some point Plaintiff was re-designated as an employee under Article 7D.  Thus, Defendant Local was only required to reimburse the MDOC for Plaintiff's employee benefits.

On February 7, 2001, while Plaintiff was working for Defendant Local, Plaintiff's former MDOC supervisor, Hampton Walker, filed a complaint against Plaintiff with the State of Michigan Board of Psychology and the Michigan Department of Consumer and Industry Services.  The complaint alleged, among other things, that Plaintiff (1) hindered the inmates' ability to obtain parole by failing to complete reports used by the Parole Board in making its decision; (2) frequently failed to respond to mental health referrals, placing prisoners at risk; (3) demonstrated inability to follow MDOC job expectations; (4) abandoned four one-year psychotherapy groups six weeks before their completion; (5) retaliated against supervisors who had attempted to address her shortcomings by levying unfounded allegations of assault and harassment; (6) failed to provide adequate documentation of her therapeutic intervention; and (7) misrepresented her educational

4

experience on her resume and license application. *See* Plaintiff's Ex. 9. Plaintiff alleges that after a State investigation into the complaint, "all of the . . . allegations were proven to be untrue and were dropped by the [state]." Plaintiff's Response to Defendants' Motion for Summary Judgment, at 5.

Contrary to Plaintiff's contention that "all" of the allegations were "dropped," the State filed a five-count administrative complaint against Plaintiff on November 9, 2001, alleging negligence, failure to conform to the minimal standards of acceptable practice, lack of good moral character, fraud or deceit in obtaining or renewing a license, and failure to obtain a master's degree in psychology from an accredited college. *See* Defendant's Ex. 11. On December 12, 2002, Plaintiff and the State agreed to a consent order dismissing all counts of the administrative complaint *except* Count IV, which alleged fraud in connection with Plaintiff's application for a license to practice psychology. *See* Defendant's Ex. 14. On her 1989 State of Michigan license application, Plaintiff indicated that she received a Master's Degree when she had never received such a degree. She did, however, complete master's level course work on her way to obtaining her doctorate in psychology. Thus, she was apparently qualified for the position despite her misstatement. The consent order provided for a three-month suspension of her license to practice psychology and a one-year term of probation.

According to Defendants, approximately 2,600 State of Michigan employees took early retirement in November, 2002, shortly before Plaintiff learned that her license would be suspended. Defendants allege that the retirement created a budget shortfall of approximately $28,000.00 per pay period because there were fewer union members to pay dues. *See* Rivera Dep. at 31. As a result, on December 17, 2002, at an executive meeting of the Defendant Local's Board, an African-American female Board member named Dolores Ansari moved to reduce the Defendant Local's staff

5

by laying off the least senior secretary, the least senior bookkeeper, and the least senior general clerk. These three positions were held by white females named Carol Thompson, Mary Blasius, and Cyndi Bilaski, respectively. Ms. Ansari also moved to layoff an African-American female office manager named Patricia Myles. Patricia Myles alleges that Defendant Ettinger, Defendant Local's President at the time, told her that she was being laid off because of her race. *See* Myles Aff. at ¶ 6. Finally, Ms. Ansari moved to return "all Presidential appointees to their State jobs effective January 20, 2003, with the exception of the Legislative Liaison and 1-800 Line [employees], and also abolish the specialist position." Executive Board Meeting Minutes, December 17, 2002, attached as Plaintiff's Ex. 12. The Legislative Liaison and 1-800 Line positions were both held by white males and both salaries were paid by Defendant Local. The appointed staff members to be returned to their state employment included Plaintiff, a white male named Tom Lawrence, and an African-American female named Cassandra Davis, who also voted in favor of the motion. *See* Rivera Dep. at 33, 35. The Board adopted Ms. Ansari's motion.

The Board's action required Plaintiff, as an appointee, to return to her job with the MDOC effective January 20, 2003. Defendants assert, however, that because Defendant Ettinger knew that Plaintiff's license had been suspended, she retained Plaintiff in her local union staff position so that Plaintiff could continue to receive her State salary. *See* Ettinger Dep. at 117-18; Simpson Dep. at 49. Had Plaintiff returned to the MDOC without a license, she would not have been able to practice psychology, and Plaintiff did not challenge Defendants' assertion that she would not have received a salary had she returned to the MDOC with a suspended license. Nevertheless, Defendant Ettinger testified in her deposition that pressure from the members of the Executive Board forced her to remove Plaintiff from her staff position as of February 16, 2003. *See* Ettinger Dep. at 117-18. She

6

was, however, able to negotiate with the MDOC to allow Plaintiff to be placed on annual leave until her suspension was over on March 12, 2003.  *See* Defendants' Ex. 17.  Thus, according to Defendants, Plaintiff suffered no loss in wages as a result of her license suspension due to the efforts of Defendant Ettinger.

Plaintiff maintains that Defendant Local's decision to return her to the MDOC was racially motivated.  Plaintiff alleges that Defendant Local either hired back or never laid off the white employees who were covered by the Board's resolution.  For instance, Plaintiff alleges that Tom Lawrence was hired back in March, 2003, shortly after he was returned to his State employer.[3]  *See* Ettinger Dep. at 75.  Plaintiff also alleges that the three white clerical workers were never laid off, contrary to the Board's resolution.  *See* Ettinger Dep. at 80.  Plaintiff alleges in her brief that "no explanation has been given as to why these individuals were not laid off per the board action."  Plaintiff's Response to Defendants' Motion for Summary Judgment, at 7.

Contrary to Plaintiff's claim that no explanation has been given for the retention of the clerical workers, Defendant Ettinger testified that all three positions were saved as a result of bargaining with the union representing the three employees.  *See* Ettinger Dep. at 79-81.  The December 17, 2002, Board resolution stated that the clerical positions would be eliminated unless Defendant Local could save at least $150,000.00 as a result of bargaining.  *See* Defendants' Ex. 12.  Defendant Ettinger testified that the least-senior secretary, Carol Thompson, took a position with

---

[3] With the exception of two pinpoint citations to Plaintiff's deposition that are taken directly from Defendants' Motion for Summary Judgment, Plaintiff's counsel has failed to provide pinpoint citations to the depositions which he relies upon.  Thus, the Court has read and re-read hundreds of pages of deposition testimony in an attempt to match Plaintiff's allegations with the evidence in the record.  The Court finds Plaintiff's counsel's lack of effort disappointing to say the least.

a different union, and the union representing the clerical employees made various concessions, resulting in a savings of over $150,000.00.  *See* Ettinger Dep. at 80-81.

On February 18, 2003, shortly after Defendant Ettinger informed Plaintiff that she would be returning to her MDOC employment, Plaintiff faxed a memorandum to Defendant Ettinger stating the following, in pertinent part:

> The purpose of this communique is to inform you that I was released from the hospital on 2/16/2003.  Currently my physician has place [sic] me on total disability.  Please utilize my sick leave bank during the period that I am off from work with the UAW.  Thus, due to my current medical condition and leave status I will be unable to perform my UAW duties until further notice.

Defendants' Ex. 19.  Plaintiff testified in her deposition that her disability began during January, 2003, and that it was still present at the time of her deposition, although she did not file for workers' compensation or social security benefits.  *See* Simpson Dep. at 7-9, 176, 181.  Defendants argue that Tom Lawrence was hired back to handle grievances instead of Plaintiff because unlike Plaintiff, Tom Lawrence did not allege that he was totally disabled and unable to work.  *See* Ettinger Declaration, at ¶ 4.  Plaintiff alleges that she remained on sick leave and did not return to her employment with the MDOC until June 9, 2003.  *See* Simpson Dep. at 168-71.

After the MDOC learned that Plaintiff would be returning, it began investigating the resume fraud allegations that resulted in the suspension of her license to practice psychology while she was working for Defendant Local.  *See* Defendants' Ex. 24.  On February 26, 2003, MDOC's Region III Prison Administrator, Barbara Bock, assigned an investigator named Steven Wendry to Plaintiff's case.  Mr. Wendry submitted a report on March 24, 2003, in which he found that (1) Plaintiff falsely stated that she had obtained a Master's Degree on her 1989 State of Michigan license application, (2) Plaintiff stated on her 1994 license renewal application that she had never been convicted of a

8

crime, but on her 1989 application for employment she indicated that she had been convicted of a "misdemeanor check violation in 1985, which was reduced from a felony[,]" (3) Plaintiff submitted resumes to two other facilities in 1999 that also falsely indicated that she obtained a Master's Degree, and (4) Plaintiff submitted an Activity Report in which she claimed that she held Emergency Crisis Intervention sessions with three inmates who had been transferred to a different location before the time period covered by the Activity Report.  *See id.*  Mr. Wendry concluded that the evidence appeared "to establish a pattern of activity on the part of Sheabra Simpson of fraudulently misrepresenting her educational degrees and professional experience."  Defendants' Ex. 29.

On March 26, 2003, MDOC notified Plaintiff of a disciplinary conference to be held on April 9, 2003, before Barbara Bock.  *See* Defendants' Ex. 30.  The notice indicated that Plaintiff was being charged with violations of three employment rules; specifically, (1) Conduct Unbecoming a Departmental Employee; (2) Dereliction of Duty; and (3) Falsification or Altering Documents.  In addition, the notice informed Plaintiff that the charges could result in anything from a written reprimand to dismissal.  *See id.*

On June 5, 2003, Barbara Bock issued her determination after hearing the parties' evidence at the disciplinary hearing.  *See* Defendants' Ex. 37.  Ms. Bock sustained the rule violations, finding that "[w]hatever her reason, Dr. Simpson repeatedly portrayed to the Department of Corrections that she has a Master's degree in Psychology."  *Id.*  Ms. Bock recommended submitting the information to the "Bureau of Human Resource Administrator's designee for discipline for a determination as to the appropriate penalty."  *Id.*

On June 9, 2003, Plaintiff was issued an "Interim Employee Rating" by the MDOC

9

indicating that Plaintiff's performance was "below an acceptable level." Defendants' Ex. 38. The rating listed a number of performance problems, including Plaintiff's failure to complete activity logs and document reports, her termination of group therapy sessions without her supervisor's knowledge, her "insolent, inaccurate, misleading, and evasive" responses to her supervisor's inquiries about job performance issues, and her general carelessness and negligence. *Id.* On June 19, 2003, MDOC issued an Employee Disciplinary Report terminating Plaintiff's employment.

On June 26, 2003, Plaintiff filed a charge of discrimination with the EEOC against Defendant Local. *See* Plaintiff's Ex. 19. Plaintiff alleged that Defendant Local terminated her based on her race and gender. Although none of the parties mention the outcome of the discrimination charge, based on Plaintiff's deposition testimony it appears that the charge was dismissed by the EEOC. *See* Simpson Dep. at 108-109.

Finally, on July 11, 2003, Plaintiff appeared at Defendant Local's office to participate in ballot counting for a union election. *See* Compl. at ¶ 63. Plaintiff was a candidate for the position of Steward-at-Large. *See* Simpson Dep. at 111. During the ballot counting, however, Plaintiff alleges that Defendant Local's Recording Secretary, a white female named Dorothy Dilsaver, screamed at Plaintiff and repeatedly called her a "dumb bitch." *See* July 12, 2004, Compl. at ¶ 63. Plaintiff also alleges that Ms. Dilsaver yelled "how do people pay their bills if they are fired?" *Id.* Plaintiff argues that Ms. Dilsaver's conduct is only one example of the hostile atmosphere she experienced. Plaintiff also argues that Ms. Dilsaver's comment about her being fired demonstrates that Defendant Local had advance knowledge that the MDOC had terminated her, yet none of Defendant Local's representatives ever filed a grievance on her behalf.

**B.      Procedural History**

On July 12, 2004, Plaintiff filed a First Amended Complaint in this Court, alleging the following counts:

| | |
|---|---|
| Count I | Discrimination - Violation of Title VII of the Civil Rights Act of 1964; |
| Count II | Retaliation - The Civil Rights Act of 1964, 42 U.S.C. Chapter 21, § 2000E-2; |
| Count III | Employment Discrimination - 42 U.S.C. § 1981; and |
| Count IV | Exemplary Damages. |

*See* Compl.  Under Count I, Plaintiff alleges that Defendants discriminated against her by forcing her to return her State employment with the MDOC.  With respect to Count II, Plaintiff alleges that Defendants forced her to return to her State employment in retaliation for assisting other union members in filing discrimination charges with the EEOC against Defendant Local.  Finally, with respect to Count III, although it is not entirely clear, Plaintiff seems to claim that Defendant Local caused her to be terminated from her employment with the MDOC by returning her to the MDOC while her license to practice psychology was suspended.  This case has proceeded through the discovery phase and is now before the Court on Defendants' motion for summary judgment.

## III.  LEGAL STANDARD

**A.      FED. R. CIV. P. 56**

Summary judgment is appropriate only if the answers to the interrogatories, depositions, admissions, and pleadings combined with the affidavits in support show that no genuine issue as to any material fact remains and the moving party is entitled to judgment as a matter of law.  *See* FED.

11

R. CIV. P. 56(c).  A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted).  In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "If the evidence is merely colorable or is not significantly probative, summary judgment may not be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial.  *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324.  The non-moving party must do more than show that there is some metaphysical doubt as to the material facts.  It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment.  *See Moore v. Phillip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

# IV.  ANALYSIS

Defendants argue that Plaintiff has failed to demonstrate any racially motivated adverse employment action, any racially motivated interference with her right to contract, or any retaliation. Defendants also argue that Plaintiff's claims are barred by her failure to exhaust various administrative remedies afforded by the Michigan Civil Service Rules and the Defendant

12

International Constitution. Because the Court finds that Defendants are entitled to summary judgment on the merits of Plaintiff's claims, the Court need not address Defendants' exhaustion arguments.[4]

**A.    Defendant Local's Motion for Summary Judgment**

   *1.    Plaintiff's Race Discrimination Claim Under Title VII*

Plaintiff argues that Defendant Local returned her to the MDOC to face certain dismissal because of her race. Plaintiff argues that Defendant Local's racial animus is made evident by (1) its re-appointment of Tom Lawrence, a white male, to a grievance handler position shortly after he was returned to his state employment, (2) its refusal to lay off the three white female clerical workers who were ordered to be laid off pursuant to the Board's order, (3) its decision to retain two white males, Alan Kilar and Ted Griggs, in the Legislative Liaison and 1-800 Line positions, respectively, and (4) the affidavit of Patricia Myles in which she alleges that Defendant Ettinger told her that she was being terminated because of her race.[5] Defendants argue that Plaintiff's racial discrimination claim should be dismissed because it had legitimate business reasons for all of its

---

[4] The Court does note, however, that the Seventh Circuit has held that there is no exhaustion requirement under Title VII or § 1981. *See Donaldson v. Taylor Prods.*, 620 F.2d 155, 158 (7th Cir. 1980).

[5] Plaintiff also alleges that Defendant Local discriminated against her by forcing her to take a higher caseload, refusing to let her participate in out-of-town conferences, and refusing to offer her training. In response, Defendant Local provided the affidavit of the Linda Taylor-Lewis, the former president of Defendant Local, which sets forth with accompanying documentation how Plaintiff attended numerous training sessions and out-of-town conferences, and that Plaintiff had the lowest grievance handling caseload among the Chief Stewards-At-Large. Instead of challenging the merits of Ms. Taylor-Lewis's affidavit, Plaintiff argues that her affidavit should be stricken because Ms. Taylor-Lewis was not listed on Defendant Local's witness list. A cursory review of that list, however, shows that Ms. Talyor-Lewis is plainly shown as witness number 40. *See* Plaintiff's Ex. 3. Thus, the Court finds Plaintiff's allegations in this regard to be without merit.

13

actions.

Title VII provides, in pertinent part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Since Plaintiff relies upon circumstantial rather than direct evidence of discrimination, Plaintiff's race discrimination claims are governed by the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The Supreme Court described the burden-shifting framework as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

As an initial matter, although Defendant Local has consistently argued that Plaintiff's position was eliminated as part of a RIF, neither party has addressed the *prima facie* case standard specifically applicable to RIFs. Under the non-RIF *prima facie* standard, a Plaintiff alleging racially based termination must prove, among other things, that "she was replaced by a person outside the class." *Mitchell v. Toledo Hosp.* 964 F.2d 577, 582 (6th Cir. 1992). In this context, Plaintiff argues that she was replaced by Tom Lawrence. Defendant Local responds by arguing that it had legitimate reasons for reappointing Tom Lawrence. Thus, Defendant Local's response ignores the issue of whether Plaintiff was replaced and instead skips to the issue of whether there was a legitimate reason

14

for its action.  In the non-RIF case, the Court would assume that Plaintiff established a *prima facie* case and address Defendant Local's alleged reasons.  *See Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858 860-63 (6th Cir. 1997)) (once a defendant 'responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection,' whether or not the plaintiff made out a prima facie case 'is no longer relevant.'").  Here, however, the issue of whether Plaintiff was replaced determines which *prima facie* standard will apply.  If Tom Lawrence replaced Plaintiff, then the *prima facie* standard for RIFs would not apply.  *See Barnes v. Gencorp., Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)("An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge.").  Thus, the issue of replacement must be resolved before determining whether Plaintiff has established a *prima facie* case.

The Sixth Circuit in *Barnes* described work force reductions in the following manner:

> It is important to clarify what constitutes a true work force reduction case.  A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company.  An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge.  However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.

*Barnes*, 896 F.2d at 1465.  Thus, a plaintiff is not replaced when either (1) another employee is assigned the plaintiff's duties in addition to other duties, or (2) the work is redistributed among other existing employees.

Tom Lawrence and Plaintiff both held grievance handling positions.  Thus, when Defendant Ettinger reappointed Tom Lawrence to handle grievances, even if he assumed all of Plaintiff's

15

previous duties, he would not have "replaced" Plaintiff in the RIF sense of the word because he would only be taking on Plaintiff's duties in addition to his own previous duties. *See Hooper v. Cargill, Inc.*, No. 98-5870, 1999 WL 552560, * 2 (6th Cir. 1999) (noting that the plaintiff "seems to use 'replacement' in its informal sense rather than conforming his usage to the definition in the *Barnes* opinion."). Had Defendant Local reappointed Tom Lawrence in addition to another non-protected individual to handle grievances, Plaintiff might have a stronger argument. Because the RIF ultimately resulted in the elimination of Plaintiff's position notwithstanding Tom Lawrence's reappointment, however, it is clear that Plaintiff was not replaced in the RIF-sense described in *Barnes*. Accordingly, the Court will apply the *prima facie* case standard applicable to RIFs.

To establish a *prima facie* case of discrimination in the RIF context, a plaintiff must show: (1) membership in a protected class, (2) qualification for her job, (3) adverse employment action, and (4) "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998) (quoting *Barnes v. Gencorp., Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)). "A plaintiff satisfies the fourth prong where he or she demonstrates that a 'comparable non-protected person was treated better.'" *Ercegovich*, 154 F.3d at 350 (quoting *Mitchell v. Toledo Hosp.* 964 F.2d 577, 582-83 (6th Cir. 1992)). A "comparable non-protected person" is one who is "similarly situated in all relevant respects." *Id.* (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). Defendant Local has not disputed that Plaintiff is a member of a protected class, that she was discharged, or that she was qualified for the position. Thus, the only

issue is whether Tom Lawrence was similarly situated to Plaintiff when he was reappointed.[6]

The Court finds that Plaintiff and Tom Lawrence were not similarly situated when Tom Lawrence was reappointed. Initially, Plaintiff was treated *more favorably* by being able to delay her return to State employment as a result of Defendant Ettinger's efforts to keep her on staff despite the Board's order. Furthermore, by the time Tom Lawrence was reappointed, Plaintiff had already indicated that she had been placed on "total disability" and that she was "unable to perform" her duties. Defendants' Ex. 19. Plaintiff's alleged inability to work is certainly a relevant distinguishing factor.

If Defendant Local planned all along to reappoint Tom Lawrence, Plaintiff might be able to show that he was treated better. There is absolutely no evidence, however, tending to show that Defendant Local undertook the entire RIF process in order to eliminate its African-American employees. Indeed, an African-American board member, Dolores Ansari, made the motion to return the presidential appointees, which included another African-American female named Cassandra Davis, to their State employment. According to the financial secretary at the time, Cassandra Davis actually voted in favor of the motion even though she was going to lose her position with Defendant Local as a result. *See* Rivera Dep. at 33, 35. Although the Supreme Court has rejected a "conclusive presumption" that an employer will not discriminate against members of his or her own race, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998), the fact that two African-Americans

---

[6] At various points in her brief, Plaintiff alleges that the employees holding the 1-800 Line, Legislative Liaison, and the three clerical positions were all similarly situated to her. There is no evidence of record, however, tending to show that Plaintiff's position was even remotely similar to any of these other positions. Although the 1-800 Line and Legislative Liaison employees were appointed, like Plaintiff, the actual jobs themselves appear to be completely different. Thus, Plaintiff has produced no facts to establish that these five white employees were "similarly situated in all respects." *Mitchell*, 964 F.2d at 583.

helped orchestrate the RIF is certainly relevant to Plaintiff's claim that the RIF was nothing more than a ruse to eliminate African-Americans. Accordingly, the Court finds that no similarly situated employee was treated better than Plaintiff and, therefore, Plaintiff has not established a *prima facie* case of discrimination.[7]

Even if Plaintiff could establish a *prima facie* case, Defendant Local has offered legitimate reasons for each of its actions, and Plaintiff has not shown that those reasons were a pretext for discrimination. First, as noted above, Defendant Local alleges that Defendant Ettinger reappointed Tom Lawrence to a staff position instead of Plaintiff because Plaintiff indicated that she was totally disabled. *See* Ettinger Declaration, at ¶ 4. Second, Defendant Local alleges that the three clerical workers retained their jobs because one of the workers took a position with a different union, and the union representing the clerical workers made various concessions. *See* Ettinger Dep. at 79-81. Defendant Local alleges that the combination of these two factors resulted in a savings of at least $150,000.00, which meant that the jobs would not need to be eliminated according to the Board's December 17, 2002, resolution. *See* Ettinger Dep. at 79-81. Third, according to the testimony of Sharon Rivera, the Legislative Liaison and 1-800 Line positions were completely different from the grievance handling positions, which were eliminated because of the large early retirement of Defendant Local members. *See* Rivera Dep. at 38-39. Accordingly, the Court finds that Defendant

---

[7] Plaintiff attached the declaration of a woman named Hattie Tindle, who claims that Defendant Local protected three white males from being fired by their State employers by keeping them on Defendant Local's staff. Plaintiff, however, did not rely on Ms. Tindle's declaration in her response to the motion for summary judgment. In addition, Ms. Tindle testimony appears to be based on rank speculation rather than personal knowledge because she provides no factual basis for her belief that the State intended to fire the individuals referenced in her declaration. Accordingly, even if Plaintiff had relied on Ms. Tindle's declaration, the Court finds that it does not create a genuine issue of material fact.

Local has easily met is burden to articulate legitimate reasons for its actions. *See Burdine*, 450 U.S. at 254 ("The defendant need not persuade the court that it was actually motivated by the proffered reasons, but it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.").

Plaintiff can challenge the reasons articulated by Defendant Local "by showing that the proffered reason[s] (1) [have] no basis in fact, (2) did not actually motivate the Defendants' challenged conduct, or (3) [were] insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir. 2001). Plaintiff appears to rely solely on the second option. Thus, Plaintiff "admits the factual basis underlying [Defendant']s proffered explanation and further admits that such conduct *could* motivate dismissal," and she must offer evidence tending to prove "that an illegal motivation was *more* likely than that offered by [Defendant]." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Whichever option Plaintiff chooses to pursue, she must offer "sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against [her]." *Braithwaite v. Timken Co.,* 258 F.3d 488, 493 (6th Cir.2001) (alteration in original) (internal quotation marks and citation omitted). "Accordingly, the plaintiff must allege more than a dispute over the facts upon which his discharge was based. [She] must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite*, 258 F.3d at 494 (citations omitted). If Plaintiff can show that Defendant Local's proffered, nondiscriminatory reasons are pretextual, the trier of fact may infer discrimination. *See Dews*, 231 F.3d at 1021 (citation omitted).

Plaintiff's response brief contains essentially two arguments challenging Defendant Local's motivations. First, Plaintiff argues that financial difficulties could not have motivated Defendant Local's conduct because the MDOC paid Plaintiff's salary, unlike the 1-800 Line and Legislative Liaison salaries, which were paid by Defendant Local. Plaintiff argues that if Defendant Local was really concerned about its finances, it would have laid off the employees whose salaries it paid, not the employees who were paid by the State. Second, Plaintiff argues that Defendant Ettinger's statement to Patricia Myles that Ms. Myles was being laid off because her race tends to show that Defendant Local also returned Plaintiff to her State employment because of her race.[8]

The Court finds neither of Plaintiff's arguments persuasive. First, the Court finds that no reasonable jury could conclude that Defendant Local's actions were racially motivated rather than financially motivated based on the MDOC's payment of Plaintiff's salary. Plaintiff has offered no evidence to challenge the financial secretary's testimony that the early retirement of union members caused a $28,000.00 per pay period shortfall in revenue. *See* Rivera Dep. at 31. It is undisputed that Defendant Local was required to reimburse the MDOC each month for Plaintiff's employee benefits.[9] In addition, Plaintiff's argument that she was working for free because the MDOC paid

---

[8] Plaintiff's other arguments miss the mark. For instance, Plaintiff argues that none of the white clerical workers were ever laid off. This argument, however, completely fails to address the legitimate explanation put forth by Defendant Local for why these individuals were not laid off. Plaintiff also argues that Defendant Local knew that Plaintiff would be fired by MDOC when she returned to work. Even if that were true, however, Plaintiff has not shown that Defendant Local returned her to State employment to be fired because of her race. In other words, the awareness that Plaintiff would be fired does not necessarily equate to racial animus.

[9] Although Plaintiff alleges that she offered to pay for her own benefits, the Court finds no evidence of record supporting this assertion, despite Plaintiff's general citation to Defendant Ettinger's deposition.

20

for her salary ignores the fact that under the CBA, Defendant Local was limited in the number of

employees that could receive State salary.  *See* Plaintiff's Ex. 17, Art. 7D ("The Union shall

designate to the Employer in writing the names of its officers or other elected or appointed officials

entitled to utilize such administrative bank.  The Union may designate up to ten (10) representatives

who shall be the only ones permitted to use such bank.").  The Financial Secretary also specifically

testified that a person with a high hourly rate, such as Plaintiff, could prevent Defendant Local from

using Article 7D leave for someone else who might make slightly less per hour:

> Q.  How would the pay of [appointed] Chief Stewards-at-large be
> handled by UAW Local 6000?
>
> \*          \*          \*
>
> A.  [I]t depends on the situation, how many people we have off on
> leave and what the hourly rates are, and at what point in the quarter
> it is, because the collective bargaining agreement, under Article 7D
> says that we get a bank of hours, and once we exhaust that bank of
> hours then sometimes we have to take a person off of 7D.  What the
> procedure is, is we take the least costly of the appointed staff off of
> 7D, and then re-designate them at 18D, depending upon if the leave
> banks getting exhausted for 7D.  So, you['re] constantly monitoring
> the leave banks to measure that it's being used properly in the best
> financial interest of the local union.  Like, for example, we might
> have someone on staff who was making $27 an hour.  Then, the
> president would appoint someone who made $29 per hour.  You
> would take the $27 an hour person off of 7D and put the $29 an hour
> person on 7D, and the State is flexible about that; allowing us to
> designate what person is going to be on 7D.

Rivera Dep. at 27-28.  Thus, by eliminating Plaintiff's position, Defendant Local could apply Article

7D leave to another employee and avoid paying that employee's salary, thereby reducing its overall

costs.  Accordingly, the Court finds that the MDOC's payment of Plaintiff's salary does not show

that Defendant Local's financial reasons for terminating her leave and returning her to the MDOC

were a pretext for discrimination.

Second, the Court finds the affidavit of Patricia Myles is not sufficient to create a genuine

21

issue of material fact.  Defendant Ettinger testified that she was against the motion to layoff Patricia Myles because she felt that as president she should have had the opportunity to "come up with savings without having to lay people off."   Ettinger Dep. at 81.   With respect to presidential appointees such as Plaintiff, however, Defendant Ettinger was in favor of the layoff, and she had already started the process of notifying the appointees that they would be returned to their State employment before the Board voted for their return.  *See* Ettinger Dep. at 83-84.  Thus, assuming Ms. Myles's affidavit to be true, the fact that Defendant Ettinger was in favor of returning Plaintiff to her State employment tends to show that the decision was *not* racially motivated.  If Defendant Ettinger was so sensitive to the plight of Ms. Myles that she told her the Board action eliminating her position was racially motivated, it seems highly unlikely that she would be in favor of returning Plaintiff to her State employment if that decision was also based on race.  There is also no evidence of how Defendant Ettinger allegedly determined that Ms. Myles's layoff was racially motivated.  Furthermore, the Court finds that no reasonable jury would find that Plaintiff suffered discrimination based on Ms. Myles's affidavit in light of the overwhelming evidence supporting the legitimate non-discriminatory reasons for Defendant Local's actions.  Accordingly, the Court finds that Defendant Local is entitled to summary judgment with respect to Plaintiff's claim of race discrimination under Title VII because even if Plaintiff established a *prima facie* case of discrimination, which she has not, Plaintiff has not shown that the legitimate reasons articulated by Defendant Local were pretextual.  In addition, Plaintiff's failure to carry her burden under *McDonnell Douglas* with respect to her Title VII claim is also fatal to her claim under 42 U.S.C. § 1981.  *See Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004)(quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n. 5 (6th Cir. 2000)) ("The elements of [a] *prima facie* case as well as the allocations of the burden

of proof are the same for employment claims stemming from Title VII and § 1981.")

>        2.        *Plaintiff's Retaliation Claim*

Plaintiff also alleges that Defendant Local retaliated against her because of her assistance to others in filing discrimination complaints against Defendant Local.  To establish a *prima facie* case of retaliation, the plaintiff must offer probative evidence of the following: (1) she engaged in a protected activity; (2) this exercise of protected rights was known to defendant; (3) the defendant thereafter took adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action.  *See Johnson v. United States Dep't of Health and Human Servs.*, 30 F.3d 45, 47 (6th Cir. 1994).  Plaintiff has presented no evidence on any of the four factors; nor does it appear that Plaintiff filed a charge with the EEOC alleging retaliation. Accordingly, Defendant Local is also entitled to summary judgment on Plaintiff's retaliation claim.

**B.        Defendant International's Request for Summary Judgment**

Defendant International requests summary judgment on the basis that Plaintiff failed to list Defendant International as a defendant in her discrimination charge with the EEOC.  Plaintiff did not respond to the argument, nor has Plaintiff alleged any wrongdoing by Defendant International in her response brief.  *See Samul v. Daimler Chrysler Corp.*, No. 99-76235, 2000 WL 1480890, *7 (E.D. Mich. Aug. 29, 2000) (Borman., J.) (citing *Ryan v. General Motors Corp.*, 929 F.2d 1105 (6th Cir. 1989)) ("[T]he local Union and the International Union are separate legal entities, and one is not accountable for alleged misconduct by the other.").  Accordingly, Defendant International is also entitled to summary judgment.

# V.  CONCLUSION

23

Accordingly, for the reasons set forth above, Defendant Union's Motion for Summary Judgment is hereby GRANTED.


IT IS SO ORDERED.


s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  July 6, 2005

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on July 6, 2005.


s/Marie E. Verlinde
Case Manager
(810) 984-3290

24